IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| v. | : | CRIMINAL NO.: |
| SAMUEL AVELLANEDA-DIMAS | : | 1:17-CR-338-ELR-JSA |
| and EDER DIMAS-MALDONADO, | : | |
| | : | |
| Defendants. | : | |

## **REPORT AND RECOMMENDATION**

Defendants were arrested—and subsequently charged with drug trafficking and firearms possession charges—based on evidence discovered during an allegedly consensual search of their residence on June 29, 2017.  Defendants now move to suppress the proceeds of this search as well as the various statements that they made to the officers.  After a two day evidentiary hearing, *see* Transcripts, February 26, 2018 Hearing [53] ("Tr."), April 9, 2018 Hearing [54] ("Tr. II"), and post-hearing briefing, [58][59][62][63], the matter is now before the undersigned. For the reasons stated below, the Court **RECOMMENDS** that the Defendants' Motions to Suppress [33][34][35][36][37] be **DENIED**.

## **FACTUAL BACKGROUND**

On June 29, 2017, Special Agents ("S/As") with Homeland Security Investigations ("HSI") went to the Valley Oak Apartments in Chamblee, Georgia,

looking for Defendant Avellaneda, who they understood was a previously-removed alien with a drug trafficking conviction.  Tr. at 8.  The agents had received "information from a source of information" that Defendant Avellaneda was residing in an apartment in that complex.  *Id.*  S/As Joshua Smalley and David Silka were in one vehicle conducting surveillance and S/A Jon Cwieka was in another vehicle.  *Id.* at 9.

At approximately 7:20 am, the agents saw Defendant Dimas—who was not previously known to the agents—leaving an apartment at which they believed Defendant Avellaneda might be located.  *Id.* at 9-10.  Agents Smalley and Silka approached Defendant Dimas in the parking lot and, after determining that Defendant Dimas did not speak English, S/A Smalley spoke to him in Spanish.  *Id.* at 10-12.  S/A Smalley, who is proficient in Spanish, "determined his true name was Eder Dimas-Maldonado and that also he was illegally present in the country." *Id.* at 10-11.  Defendant Dimas also confirmed that he was living in Apartment A of Building 2446.  *Id.* at 10.  The agents were dressed in plain clothes and their firearms were concealed during this encounter.  *Id.* at 12.  The agents, however, openly displayed either an actual badge or were wearing a jacket with a visible HSI shield and badge.  *Id.* at 74.  Agent Smalley acknowledged that it was clear that they were acting as police officers when they approached the Defendant and asked him, among other things, whether he was legally present in the country.  *Id.*

The agents took custody of Dimas's Mexican passport during this initial encounter, and could not recall when it was returned. *Id.* at 71-72. The agents initiated this encounter as Dimas was approaching the driver's side door of his car, but the agents denied physically blocking Dimas from opening his car. *Id.* at 68.

After determining his identity and immigration status, S/A Smalley asked Defendant Dimas if he lived alone. The Defendant initially stated that he lived alone, but then "changed his story and said that he lived with his cousin but he wouldn't give me his cousin's name." *Id.* According to S/A Smalley, "I then asked Mr. Dimas if we could go to his apartment and if we could speak to his cousin. He said sure, and he walked us to the door. As we walked to the door, Agent Cwieka joined us, so now there were three of us following Mr. Dimas to his door." *Id.* at 12-13.

Defendant Dimas walked the agents to the door, pulled the key out of his pocket, and "opened the door for us." Tr. at 13, 42-43. Initially, Dimas tried to hand the agents the keys when they asked if he could open the door to the apartment. Tr. at 72. Agent Smalley stated that "I told him, no, I'd prefer that he open the door himself." *Id.* at 72. S/A Smalley did not recall who entered the apartment first after Defendant Dimas opened the door. *Id.* at 44-45.

As the group was entering through the door, S/A testified that Defendant Dimas called out "Primo," and Defendant Avellaneda came out of one of the bedrooms.  *Id.* at 44.  S/A Cwieka separately testified that the agents also yelled out "police" as they entered.  Tr. II at 34.  The agents had their guns drawn, but pointing at the floor, as they entered.  Tr. at 54-55.  S/A Smalley then directed Defendant Avellaneda to step into the living room area, and then S/A Smalley asked him about his identity and citizenship.  Tr. at 14.  Because Defendant Avellaneda spoke and understood English, S/A Smalley conversed with him in English.  *Id*.  Defendant Avellaneda identified himself and admitted that he was a Mexican citizen illegally present in the United States.  *Id*.

S/A Smalley then asked Defendant Avellaneda, "do you mind if we search your room."  Tr. at 14, 47.  Avellaneda stated that he did not mind, and directed the agents to the bedroom on the right-hand side of the apartment.  *Id*.  S/A Smalley also, in Spanish, asked Defendant Dimas for consent to search his bedroom, to which Defendant agreed and pointed to the bedroom on the left.  *Id.* at 16.  S/A Smalley did not record this discussion and did not use any written consent forms, even though he had copies of such forms in his car.  *Id*. at 18.

The agents first searched Defendant Avellaneda's room and discovered a bag containing what appeared to be narcotics during this search, hidden under a pair of jeans piled on top of a television.  Tr. at 19, 51-53.  The agents

subsequently returned to the living room and arrested Defendant Avellaneda. *Id*. at 21. Although S/A Smalley testified that he had already requested and received consent from Defendant Dimas, Agent Cwieka separately asked Defendant Dimas in Spanish "if we could search his bedroom." Tr. II at 37-38. Defendant confirmed that, "yes, we could search." *Id*. During the discussions with the Defendants about consent to search, neither Defendant was restrained or subjected to any physical force, and the agents did not have their guns drawn. *Id*. at 38-39; Tr. at 16. The agents did not otherwise yell at or threaten the Defendants or provide any promises to them. Tr. at 29-31.

The agents searched Dimas's room and observed firearms and ammunition. Tr. at 59. The agents then arrested Dimas. *Id*. at 23.

After arresting the Defendants, the agents advised the Defendants of their *Miranda* rights both verbally and by way of providing a form. Tr. at 24-27. Both Defendants invoked their *Miranda* rights by requesting an attorney. *Id.* at 25, 28. Defendant Avellaneda, however, then announced, apparently not in response to any questioning, that "that stuff is mine." *Id.* at 25. S/A Smalley understood Avellaneda to mean that the evidence found in the apartment was his, not Defendant Dimas's, in a possible effort to protect Dimas, "who was his cousin." *Id.* at 25-26. S/A Smalley also asked Defendant Avellaneda for identification "for booking purposes." *Id.* at 26. Defendant informed S/A Smalley that his Mexican

passport was in his car, and he provided the car keys to S/A Smalley so that S/A
Smalley could retrieve the document.  *Id.*  S/A Smalley did so, and Defendant
Avellaneda suggested that the agents should just send him back to Mexico.  *Id.* at
64-65.  The agents did not further question Defendant Dimas, as they apparently
already had custody of his identification.  *Id*. at 28.

After these events, officers from the City of Chamblee Police Department
obtained and executed a search warrant for the apartment.  It is undisputed that the
Chamblee warrant was based in substantial part on the information obtained by the
HSI agents and the material observed and found in the allegedly consensual HSI
searches.

## ANALYSIS

**A.** *The Alleged Consensual Searches of the Apartment*

A warrantless entry of an individual's home is presumptively unreasonable.
*See United States v. Tovar-Rico*, 61 F.3d 1529, 1534 (1995).  Warrantless entries
into and searches of such premises are permitted, however, where the prosecution
proves that the police acted upon the voluntary and freely-given consent of a
resident.  *See, e.g., United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989).

 "In order for consent to a search to be deemed voluntary, it must be the
product of an essentially free and unconstrained choice." *Id.* at 360.  In

considering whether a consent to search was voluntary, the Court must examine the totality of the circumstances.  *Tovar-Rico*, 61 F.3d at 1535 (11th Cir. 1995); *see also United States v. Gonzalez*, 71 F.3d 819, 828-32 (11th Cir. 1996) (illustrating factors properly to be considered in totality of circumstances inquiry).  Further, "'[t]he government bears the burden of proving . . . that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.'"  *United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993) (*quoting United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989)).  The absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that "[w]here there is coercion, there cannot be consent."  *Gonzalez*, 71 F.3d at 828 (*quoting Bumper v. North Carolina*, 391 U.S. 543, 550 (1968)).  *See also Florida v. Bostick*, 501 U.S. 429, 438  (1991) ( "'Consent' that is the product of official intimidation . . .  is not consent at all.").

The Eleventh Circuit has identified a non-exhaustive list of relevant factors to consider when assessing the voluntariness of a consent to search: voluntariness of the defendant's custodial status, the presence of coercive police procedures, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found.  *United States v. Blake*, 888 F.2d 795, 798-9 (11th Cir. 1989).

Here, Defendants make two interrelated arguments.  First, both Defendants argue that the agents' initial entry into the apartment was unlawful, because Dimas simply acquiesced to a show of authority—and did not voluntarily consent—when asked to unlock the door and allow the agents inside.  Second, relatedly, each Defendant argues that the prosecution cannot prove that he voluntarily consented to the search of his bedroom.  The Defendants point out that they were never advised of their right to refuse consent, that they had both just admitted their illegal status in the country to immigration officers, and that it was unrealistic for individuals in their position to believe that they possessed a free and unrestrained choice but to acquiesce.

It is undisputed in this case that the agents did not affirmatively advise the Defendants of their right to refuse consent, and that the agents did not even provide the Defendants with standard consent-to-search forms that would presumably have included such advice.  Nevertheless, the Eleventh Circuit has made clear that the Government is not required to prove that the Defendant was advised as to, or otherwise understood, his right to refuse consent.  *See, e.g., United States v. Chemaly*, 741 F.2d 1346 (11th Cir. 1984).  Rather, the Defendants' awareness of such rights is but one factor in the analysis, which in this case weighs against, but does not defeat, a finding of voluntariness.

The first issue before the Court relates to S/A Smalley's request of Defendant Dimas—in the parking lot of the apartment complex— "if we could go to his apartment and if we could speak to his cousin." Tr. at 12-13. At the outset, the Court disagrees with the Government's argument that the Defendant was not in custody, or was at least not involuntarily seized, at the time of this request. By this point, Defendant had admitted to immigration agents that he was present in the United States illegally, and the agents had taken custody of Defendant's Mexican passport, *Id*. at 71-72, presumably Defendant's most vital identification paperwork. As other courts have stated in similar circumstances, "[t]he Eleventh Circuit and other courts have held that when an individual's identification is taken and retained by law enforcement, a reasonable person in that individual's shoes would not feel free to leave." *United States v. Harrold*, 679 F.Supp.2d 1336, 1344 (N.D. Ga. 2009) (Thrash, J.) (*citing United States v. Thompson*, 712 F.2d 1356, 1359 (11th Cir. 1983) (finding that an investigative stop at an airport became a seizure when an officer asked defendant to produce an object from his car while the officer retained defendant's driver's license because "[w]ithout his driver's license [defendant] was effectively immobilized"); *United States v. Glover*, 957 F.2d 1004, 1009 (2d Cir. 1992) (holding that a seizure occurred when a law enforcement officer asked defendant to go to a private office for questioning, retained defendant's identification, and did not tell defendant he was free to leave).

The Government argues that "[a]t this point, Agents had no reason to suspect Dimas was involved in any crime . . . ."  Gov't Br. [62] at 3.  This may be true, in the technical sense that mere illegal presence in the United States (as distinct from illegal *entry*) is a civil, not criminal violation.  But a reasonable alien in Defendant's shoes would have concluded that having made an admission of illegal presence to immigration officers, and having those officers take custody of his passport, that he was not simply free to leave.  Even if the Defendant believed that the immigration officers would have allowed him to walk away, doing so would have required abandoning his passport, which the Government does not suggest a reasonable person would have done.  Thus, the Court finds that the Defendant had been involuntarily seized at least as of when he agreed to bring the agents to the apartment.

Nevertheless, although the Defendant had been involuntarily seized, and was not advised of his right to refuse consent, courts have found consents to be voluntary in significantly more extreme circumstances.  *See United States v. Espinosa-Orlando*, 704 F.2d 507 (11th Cir. 1983) (consent to search free and voluntary where suspect was lying face down in the grass next to a roadway, with four police officers having just pointed guns at him, where one of those officers was still brandishing a gun, where the suspect agreed to the "conversational"

request of an officer, who had just taken the suspect's car keys, "do I have your permission to look in, to open the trunk of your car and look inside the suitcase?")

On balance, reviewing the totality of the facts, the Court finds that Defendant Dimas's agreement to bring the agents to the apartment for purposes of allowing them to talk to the Co-Defendant, was voluntary.  According to the unrebutted testimony of the agents, S/A Smalley's words were in the form of a request, not a demand.  As S/A Smalley explained, without contradiction, he asked Defendant, "would you mind if we come to your apartment and talk with your Primo?"  Tr. at 42.  The Defendant affirmatively responded "sure," and that he "didn't mind."  Tr. at 12, 42.  While Defendant characterizes Defendant's agreement as acquiescence to a claim of lawful authority, there is no evidence that the agents made any claim of lawful authority to enter the apartment.  To the contrary, the record shows only that the agents politely asked for (and received) permission.  This suggests voluntariness.

The facts also do not show that the agents made any physical or verbal threats or promises to extract this limited consent.  The agents did not yell at the Defendant, pull out any gun, use force, or restrain him.  While Defendant would have reasonably assumed that he would have to deal with a civil immigration problem, there is no indication that the agents accused him of any criminal act.  And this encounter occurred in a public location familiar to the Defendant.  Thus,

perhaps the seminal factor—the absence of coercive police activity—weighs in favor of finding voluntariness.

Moreover, on its face, this was a limited request for entry into the apartment for the specific purposes of speaking to Dimas's cousin, but not as a request for any search therein.  If anything, this would have suggested that the officers were not primarily interested in Dimas, and were asking simply to "talk" to another individual.  A person in Dimas's position would not likely have concluded that incriminating information relating specifically to him would be revealed by simply agreeing to the limited request to take agents to an apartment to "speak to his cousin."  Thus, on balance, the evidence suggests that Defendant Dimas voluntarily agreed to bring the agents to the apartment at which he resided, and that the agents' entry into the common areas of that apartment for purposes of attempting to talk with "Primo" was lawful.

Whether the agents then received voluntary consent from each Defendant to search their own individual bedroom is a separate question.  Certainly, as noted above, Defendant Dimas's agreement to bring the agents to the apartment to speak with his "Primo" did not itself constitute agreement to any subsequent search.  But to the extent the Defendants argue that any subsequent consents were involuntary as fruits of an initial unlawful entry into the apartment at all, that argument fails, because the initial entry was lawful.

As to the voluntariness of Defendant Dimas's and Defendant Avellaneda's consents to search their bedrooms, the agents made this a substantially closer question than it needed to be by not taking the basic step of furnishing written notice and consent forms.  While affirmatively informing the Defendants of their right to refuse consent—via written form or otherwise—is not strictly required, it is certainly advisable, and the lack of that step here brought this analysis closer to the line than it needed to be.  After all, several other factors weighed against voluntariness.  At this point, at least Defendant Dimas would have clearly understood that he was not free to leave for the reasons explained above.  Although the agents had not yet taken custody of Defendant Avellaneda's passport as of when they requested consent to search his bedroom, he had already admitted that he was illegally present in the country, and likely understood that he would be at least civilly detained.  Therefore, reasonable alien suspects in Defendants' positions would have understood that they were being seized.

The facts also suggest at least somewhat more of a show of force than what had been displayed in the parking lot to Dimas.  The testimony shows that the officers yelled "police" when they entered, and had their guns drawn (although not specifically pointed at any individual).  And in contrast to the limited request made of Dimas in the parking lot—to simply bring the agents to the apartment so that they could talk to his cousin—the agents' subsequent requests for permission to

search the bedrooms were much more intrusive and (given what was found) more likely to result in discovery of evidence of crimes.

Nevertheless, while the question is closer, the Court still finds that the totality of facts supports the conclusion that both Defendants voluntarily consented to the search of their respective rooms. While not free to leave, the Defendants were not restrained in any way either, had not been arrested, had not been physically or verbally threatened or even substantially touched, had not been subjected to any lengthy detention or questioning, and the officers made no improper or misleading assurances or promises. That this discussion occurred in the familiar surroundings of the Defendants' own home also weighs in favor of voluntariness. The unrebutted testimony of the agents also shows that they calmly requested consent in the form of a question, and that the Defendants affirmatively verbally responded with words of asset or agreement such as "yes, we could search," Tr. II at 37-38, or that they "did not mind" if the agents searched, Tr. at 14-15, 47. Again, asking a question, "do you mind if we" or "can we" search a room is not itself a claim of lawful authority, and affirmatively responding, "yes," "I don't mind," or the like, suggests more than mere acquiescence to any such claim.

In Defendant Dimas's case, the testimony shows that he was separately asked twice for permission to search his room, by both S/A Smalley and S/A

Cweika.  Therefore, over the course of the morning, he was presented with a total of three requests, with wording such "can we" or "do you mind," and affirmatively agreed to all of them, with wording such as "yes" or "I don't mind."

While the Defendants presumably knew that some potentially incriminating evidence might be found in searches of their rooms, the evidence suggests that the evidence was at least partially hidden.  Only a limited quantity of drugs was found in Defendant Avellaneda's room, hidden under a pair of jeans.  The firearms in Defendant Dimas's room were at least partially obscured by laundry and/or in one case were in a closet.  Thus, it is plausible that the Defendants believed there was a chance that some or all of the evidence would not be found.  Moreover, at least in Defendant Avellaneda's case, he may have not fully appreciated the significance of this evidence, as he suggested that the agents just send him back to Mexico.  *Id.* at 64-65.  As to Defendant Dimas, he likely understood that the agents were primarily interested in Defendant Avellaneda, as the agents asked Dimas who he lived with and whether they could come talk to his cousin.  Dimas therefore may have inferred that he was better off seeming as if he had nothing to hide, and/or that he may have believed that Defendant Avellaneda would ultimately claim responsibility if contraband was found, as he did.  Tr. at 25 ("that stuff is mine.") In any event, that some incriminating evidence was ultimately found, in these

circumstances, while somewhat weighing against a finding of voluntariness, is not a strong factor.

In the end, the totality of the circumstances still suggests voluntariness. This case is distinguishable from *Tovar-Rico*, which Defendants cite. 61 F.3d at 1535-36. In that case, the police knocked loudly on the defendant's door, identified themselves as police, and asked to enter. In response, the defendant simply opened the door. The police then, without waiting or asking for any affirmative response to their request to enter, took it upon themselves to enter, and proceeded to go through every room in the entire apartment, as a protective sweep. Only after having been throughout the entire apartment did the officers come back to the defendant, and specifically ask her for consent to search, and provide her with a consent form. Although she signed the form, the Eleventh Circuit on these facts affirmed the district court's finding that consent was not voluntary. *Id*. The Eleventh Circuit found that the simple act of opening the door to the knocks of the police did not itself constitute consent to entry or to search, and that the subsequent written consent was tainted because the defendant "had already observed officers explore every room in the apartment and could not reasonably have known that she could still refuse a search." *Id*.

Here, by contrast, the officers not only requested permission for every entry and search that they performed, but also received affirmative verbal assent from

the Defendants *before* entering and/or searching.  The officers also did not perform a protective sweep of any premises prior to asking for, and receiving, permission to search those premises.

Courts in this Circuit have found voluntary consent in far more coercive circumstances.  As the Court has already noted, the Eleventh Circuit affirmed a finding a voluntariness in *Espinosa-Orlando*, 704 F.2d at 507, where a defendant consented after having been arrested on the side of the road at gunpoint, told to lie down in the grass with multiple officers standing over him, including one who kept his weapon drawn.  In *Garcia*, 890 F.2d at 355, the Eleventh Circuit reversed the district court's finding of involuntary consent—finding, on appeal, that the district was required to find that consent was voluntary—where the defendant had been arrested, handcuffed, restrained while agents engaged in a protective sweep, instructed to (and did) lead agents to uncover firearms maintained in the house, and only afterwards was asked for consent, while still handcuffed and surrounded by fourteen agents.  The facts here do not reveal any acts of coercion or intimidation even remotely at the level presented in *Espinosa-Orlando*, *Garcia*, or other similar cases in which consents were found to be voluntary.  These precedents strongly support finding voluntariness on the totality of the facts on this record.

Thus, the Court **RECOMMENDS** that Defendants' Motions to Suppress the fruits of the consensual searches of the apartment be **DENIED**.

## B. *Defendants' Statements*

### 1.  Legal Standards Governing Admissibility of Statements

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . without due process of law." U.S. Const. Amend. V.  Accordingly, a criminal defendant cannot be compelled, forced, tortured, threatened or coerced by law enforcement into giving a confession; for the confession to be admissible at trial against the defendant, it must have been given freely and voluntarily.  Thus, if a Defendant moves to suppress her incriminating statements to law enforcement, the Government bears the burden to show that the Defendant's statements were made voluntarily.  *See Jackson v. Denno*, 378 U.S. 368 (1964).  Determining whether a statement is voluntary depends on whether, under all surrounding circumstances, the statement was the product of the accused's "free and rational" choice. *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994); *see Arizona v. Fulminate*, 499 U.S. 279, 285 (1991). The Eleventh Circuit has stated:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

*Jones*, 32 F.3d at 1517 (quotation omitted).

In determining whether a defendant's confession was free and voluntary, the Court must assess "the totality of all the surrounding circumstances," both the characteristics of the accused and the details of the interrogation. *Miller v. Fenton*, 474 U.S. 104, 111 (1985); *see also United States v. Roark*, 753 F.2d 991, 993 (11th Cir. 1985) ("In analyzing  the voluntariness of a confession, the  totality of the circumstances surrounding the  confession must be examined.") (*citing Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

"[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citation omitted)). Factors which should be considered by courts in assessing voluntariness include the length of the interrogation, the age of the accused, and whether law enforcement used physical punishment such as the deprivation of food or sleep. *Schneckloth*, 412 U.S. at 226; *United States v. Jones*, 32 F.3d 1512, 1516 17 (11th Cir. 1994); *see also United States v. Castaneda Castaneda*, 729 F.2d 1360, 1362 (11th Cir. 1984) (the voluntariness of a confession must be evaluated on a case by case basis).

Moreover, in *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that a suspect who is in custody must be advised of his right to remain silent and of his right to the assistance of counsel prior to any interrogation by law

enforcement.  The Supreme Court made clear that "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests upon the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."  *Id*. at 475.

### 2. **Admissibility of Defendant Dimas's Statements**

Defendant Dimas argues that his "admission that he was illegally in the country [in response to the questioning in the parking lot] was elicited by questioning without *Miranda* rights and in violation of the Fifth Amendment." Dimas Br. [58] at 19.

The initial question as it relates to Defendant's *Miranda* challenge is whether the Defendant was in custody when S/A Smalley encountered him in the parking lot and asked him about his immigration status.  It is the Defendant's burden to demonstrate that he was in "custody" during questioning and that *Miranda* thereby even applies.  *See United States v. de la Fuente*, 548 F.2d 528 (5th Cir. 1977); *see also United States v. Peck*, 17 F.Supp.3d 1345, 1353-55 (N.D. Ga. 2014).  The Supreme Court in *Miranda* explained that custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  *Miranda*, 384 U.S. at 444.  The Court subsequently defined "custody" in this

context as a formal arrest or restraint on freedom of movement of the degree

associated with a formal arrest. *See California v. Beheler*, 463 U.S. 1121, 1125

(1983) (quotation marks omitted).  The Supreme Court has provided a non-

exhaustive list of factors courts should consider in determining whether a suspect

is in "custody" for purposes of Miranda:

> As used in our Miranda case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, considering the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.  And to determine how a suspect would have gauge[d] his freedom of movement, courts must examine all the circumstances surrounding the interrogation. Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.

*Howes v. Fields*, 565 U.S. 499, 508 (2012).

The Court considers Defendant Dimas to have been in "custody" for

purposes of analyzing the voluntariness of his waiver of his Fourth Amendment

rights, at least as of when the agents had seized his Mexican passport.[1]  However,

---

[1] The determination of custodial status is not necessarily the same for purposes of *Miranda*, which unlike the voluntariness of consent to search is the Defendant's burden to prove.  The Court, however, does not rest its recommendations on any distinction between the determination of "in custody" under *Miranda* versus under the Fourth Amendment, which is not a legal issue raised by the parties.

Defendant uttered the statements that he seeks to suppress—his "admission that he was illegally in the country"—prior to any seizure of his immigration papers. All that had happened by the time of these statements was that the agents approached Defendant in the parking lot, and asked his identity and immigration status. Specifically, S/A Smalley simply stated, "good morning. I'm Joshua Smalley with Homeland Security Investigations. Can I ask you a couple questions?" Tr. at 37.

At most, the Defendant was subjected to a brief investigative detention at this point. There is no basis to conclude—and Defendant has not sustained his burden to prove—that his movements were restrained to the degree associated with a formal arrest from the moment the agents approached him, politely introduced themselves, and asked him these basic questions. There is no evidence that the agents raised their voices, instructed Defendant to stop, handcuffed or otherwise restrained him, displayed weapons, put him in a squad car, transported him to an interview room, frisked him, or anything of the sort. Courts in this Circuit have rejected the existence of custodial status in circumstances involving greater exercise of authority and control than this. *See United States v. Luna-Encinas*, 603 F.3d 876 (11th Cir. 2010) (suspect was not "in custody" despite being approached by multiple officers with drawn guns, being ordered to raise his arms and sit on the ground).

A somewhat stronger argument for Defendant is that his statements even at the inception of this encounter were not voluntary.  After all, voluntariness remains the Government's burden to show, and while lack of custodial status is relevant, it is not dispositive.  Defendant argues that "the ICE agents' stealthy approach to Mr. Dimas and physical proximity, while having him trapped between two cars in the parking lot was coercive," and that "[g]iven the fear of ICE agents and the hate speech in the current political climate, and the popular advice to 'comply now, contest later,' Mr. Dimas's admission cannot be seen as voluntary."  Dimas Br. [58] at 19.

Nevertheless, in light of the relevant factors, the Court finds the Defendant's statements to have been voluntarily-given.  For all of the reasons discussed at length above with regard to the Defendants' consents to search, the Court does not find the agents' conduct to have been coercive, particularly prior to any seizure of Dimas's passport.  Among other things, the Court disagrees with Defendant's characterization that the agents "trapped" him between two cars.  The Defendant was approaching his parked car, which was next to another car in the parking lot. Tr. at 35.  But the two agents approached him from the same side—from the trunk side—and did not block Defendant's passage forward or into his driver's side door. *Id.* at 35-37, 67-68.

In any event, that the questioning was very brief, initiated by a polite request ("good morning.  I'm Joshua Smalley with Homeland Security Investigations.  Can I ask you a couple questions?"), occurred in a public place, and in a locale familiar to the Defendant, all weigh heavily in favor of finding voluntariness.  Also, while potentially exposing himself to civil removal proceedings, merely acknowledging his identity and lack of legal presence in the country was not necessarily incriminating, by itself.  Indeed, the agents had no reason to find these statements indicative of criminality, at least until they later discovered firearms in Mr. Dimas's bedroom.  Thus, there was somewhat less gravity associated with these statements in the parking lot, which were not themselves admissions of criminal activity.

The Court understands and considers Defendants' argument that this encounter occurred during a period of heightened immigration enforcement and polarizing rhetoric.  But in looking at the totality of the factual circumstances in this case, the Court does not find coercive police activity, and does not find that Defendant Dimas's will was overborne in responding to the brief, polite, and largely identification-related questioning by the agents.[2]

---

[2] Although Defendant Avellaneda initially filed a Motion to Suppress Statements [34], his post-hearing brief does not argue that his statements were involuntarily given or that the officers violated *Miranda*.  The sole argument that Defendant Avellaneda continues to assert for suppression of his statements is that they were fruits of the officers' Fourth Amendment intrusion into his residence.  *See*

## CONCLUSION

For the reasons discussed above, Defendants' Motions to Suppress

[33][34][35][36][37] should be **DENIED**.

This matter is **READY FOR TRIAL**.

IT IS SO **RECOMMENDED** this 24ᵗʰ day of July, 2018.


_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE


---

Avellaneda Br. [57] at 12-13.  Therefore, he appears to abandon any Fifth
Amendment and/or *Miranda* challenge.  In any event, for the same reasons why the
Court finds his consent to search to have been voluntary, the Court makes the same
conclusion as to his statements to the officers.  As to *Miranda*, Defendant
Avellaneda made certain incriminating statements after having been arrested and
after having invoked his right to counsel, including "that stuff is mine" (apparently
referring to the evidence obtained in the search).  *Id.* at 25.  But the Government
has shown, and the Defendant does not refute, that these post-arrest statements
were spontaneously-uttered, not in response to any interrogation by the officers.
Therefore, these statements are not subject to suppression under *Miranda*.  *See
United States v. Sanders*, 315 Fed.Appx. 819, 823 (11th Cir. 2009) (unpublished)
("[v]oluntary and spontaneous comments by an accused, even after *Miranda* rights
are asserted, are admissible evidence if the comments were not made in response to
government questioning.")  The Government likewise shows, without
contradiction, that other questions to Defendant Avellaneda during this time frame
fell under the exception for biographical and identification information for booking
purposes.  *See, e.g., United States v. Glen-Archila*, 677 F.2d 809, 815-816 (11th
Cir. 1982).